UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

BARBARA PAIGE,                          :
     Plaintiff,                        :
                                       :
                                       :
     v.                                :         C.A. No. 18-347JJM
                                       :
RHODE ISLAND PUBLIC TRANSIT             :
AUTHORITY,                              :
     Defendant.                        :

**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

This case is before the Court on the motion of Defendant Rhode Island Public Transit

Authority ("RIPTA") to enforce the terms of a settlement agreement that it claims it entered into

with Plaintiff Barbara Paige.  ECF No. 22.[1]  The motion was referred to me for report and

---

[1] After the record on this motion to enforce closed, the motion of Attorney Sonja L. Deyoe to withdraw from representation of Ms. Paige in this case, ECF No. 18, was granted by a Text Order that issued on May 24, 2021.  Attorney Deyoe had represented Ms. Paige continuously in connection with this case until 4:12 p.m. on March 25, 2021, the last day for revocation of the Settlement Agreement, when she filed the motion to withdraw.  Id.  In support of her motion to withdraw, Attorney Deyoe represented to the Court that:

> The basis for the motion is a serious breakdown of attorney client relations that makes continued representation of Ms. Paige impossible given the nature of comments made to counsel by her which are privileged, but nevertheless, a clear basis to withdraw and indicate both a lack of mistrust by Ms. Paige in Attorney Deyoe, and unspecified allegations against Attorney Deyoe of both misconduct and potentially illegal conduct.

ECF No. 20.  During the hearing on the motion to withdraw, the Court heard Ms. Paige's objection to the motion to withdraw, as well as Ms. Paige's request for a delay to find a new attorney.  The request for delay was denied after Ms. Paige conceded that she has had a total of seven attorneys representing her in connection with the consequences of the work-related incident on June 16, 2015, (including this case, the workers compensation case and the personal injury case), as well as that, when she was served with the motion to withdraw more than two months ago, she was cautioned that delay to find a new attorney might not be countenanced.  Based on Attorney Deyoe's representations and Ms. Paige's statements to the Court, I found that it would be ethically inappropriate – indeed impossible – for Attorney Deyoe to continue as Ms. Paige's attorney; I overruled Ms. Paige's objection to the motion to withdraw and determined that it should be immediately granted.  The finding that Attorney Deyoe could not continue to

recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  Consistent with that directive, I

conducted an evidentiary hearing on May 11, 2021.  Based on the evidence presented, I find that

the parties entered into an enforceable agreement to settle this case and that all of the material

terms are ascertainable because they are set forth in a writing captioned "Settlement Agreement

and Release of Claims" ("Settlement Agreement")[2] that Ms. Paige signed on March 18, 2021.

ECF No. 22-2 at 50-62.  I further find that Ms. Paige regretted her agreement because she came

to view the amount to be paid as inadequate.  Aware that the Settlement Agreement includes

Paragraph 8, which provides that it could be revoked any time prior to the close of business on

the seventh day after it was signed, on the afternoon of the seventh day, Ms. Paige began the

process of attempting to exercise her right to revoke.  However, I find that her attempts to revoke

were ineffectual because they did not comply with the Settlement Agreement's express terms.

Accordingly, I recommend that the Court grant the motion to enforce.

---

represent Ms. Paige was confirmed during the hearing on the motion to enforce when Ms. Deyoe's
testimony was required.  Nevertheless, at the Court's request, Attorney Deyoe continued to assist Ms.
Paige in a "stand-by" capacity until the record on the motion to enforce was closed.  The Court observes
that, throughout these difficult proceedings, Attorney Deyoe conducted herself in an exemplary
professional manner, carefully adhering to the highest ethical standards, including agreeing to continue by
assisting Ms. Paige with self-representation in connection with the motion to enforce.

[2] Paragraph 9 of the Settlement Agreement provides that its terms are confidential; further, the evidence
regarding its formation and revocation was filed under seal.  However, confidentiality must be set aside as
to the terms and communications regarding settlement that are necessary to the court's determination of a
motion to enforce.  Abdullah v. Evolve Bank & Tr., No. CA 14-131 S, 2015 WL 4603229, at *5 n.5
(D.R.I. July 29, 2015); see Copeland v. Dapkute, Case No. 8:17-cv-01566-PWG, 2018 WL 5619672, at
*2, 9 (D. Md. Oct. 30, 2018) (court exposes communications and declines to seal "portions of a
settlement agreement that were germane to its decision on a motion to compel enforcement of the
agreement").  Therefore, those terms and communications are openly referenced in this decision.  In
addition, the parties designated other evidence as confidential, such as the amount of Ms. Paige's
compensation and her total and net recovery in the related personal injury and workers' compensation
cases.  To respect the confidentiality of this information, the Court has referenced only what is necessary
to its determination of the motion to enforce.

I.      FACTS[3]

        A.      Formation of Settlement Agreement

On June 16, 2015, Ms. Paige, a RIPTA employee, was seriously injured when a RIPTA

bus on which she was riding was hit by a third-party.  ECF No. 22-2 at 7.  She filed a workers

compensation claim and a personal injury claim against the third party.  Ultimately, these cases

ended with Ms. Paige recovering in total a substantial amount in medical benefits, lost wages and

for pain and suffering.  Id. at 7-8, 10-11.  In addition, arising from the same incident, represented

by Attorney Deyoe, on June 4, 2018, Plaintiff filed this case.  Invoking the Americans with

Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"), Rhode Island Fair Employment Practices

Act, R.I. Gen. Laws § 28-5-1, et seq., and the Rhode Island Persons with Disabilities Act, R.I.

Gen. Laws § 42-112-1, et seq., she claimed that RIPTA violated ADA because it failed to

accommodate her when she was able to return to work.  ECF No. 1.

During the hearing on the motion to enforce, Ms. Paige testified that, sometime soon after

the ADA claim was initiated, likely in 2018, she gave Attorney Deyoe instructions regarding a

monetary amount for settlement: "if it was 30K then yes, if it wasn't, no."  Ms. Paige further

testified that nothing else was ever discussed with Attorney Deyoe on the topic of the monetary

amount she would accept for settling this case; indeed, she did not even speak at all to Attorney

Deyoe again "until March of 2021."  Based on my assessment of Ms. Paige's demeanor and

---

[3] In support of its motion to enforce, RIPTA proffered evidence (e.g., deposition excerpts, affidavits and email communications between and among counsel and the Court) regarding Ms. Paige's underlying claim, the events culminating in the signing of the Settlement Agreement and Ms. Paige's attempt to revoke.  The briefing of the motion to enforce and the hearing before me has established that Ms. Paige disputes only RIPTA's factual presentation regarding her acquiescence to the terms of the Settlement Agreement and her attempted revocation.  To the extent that RIPTA's proffer is undisputed, the findings in the text are based on this undisputed evidence.  As to the disputed facts, in addition to RIPTA's proffered evidence and the entries in the Court's docket, at the evidentiary hearing, I accepted and relied on affidavits from Attorney Deyoe's paralegal and heard testimony from both Ms. Paige and Attorney Deyoe.  Based on the foregoing, I propose findings as set forth in the text.

credibility, Attorney Deyoe's conflicting testimony as described below and the conflicting objective facts (such as Attorney Deyoe's representation of Ms. Paige at her deposition in 2019 and Ms. Paige's signature on March 2021 Settlement Agreement, which includes the monetary consideration – $5,000 – in Paragraph 1(a)), I do not find this testimony to be credible.

On July 15, 2019, defended by Attorney Deyoe, Ms. Paige was deposed and admitted that her backpay claim was for a maximum of four hours of work per day during a brief (two-month) period from June 2017 until August 2017; this is the only period during which her physician opined that she could work, but RIPTA did not allow her to return.  ECF No. 22-2 at 2-5.  Based on these admissions and RIPTA's undisputed representation regarding her rate of pay, ECF No. 22-1 at 4 n.4, the record establishes that the backpay component of Ms. Paige's claim is in the range of approximately $5,000; further, her ability to recover anything in this case would be subject to potential offset in light of her recovery in the workers compensation and personal injury cases, as well as to RIPTA's defenses regarding the appropriateness of its approach to the ADA interactive process, particularly its argument that Ms. Paige still could not perform the essential functions of her job during the brief period when she claims she was available.  See ECF No. 7 (RIPTA's Rule 16 statement).

Following these deposition admissions, on September 6, 2019, RIPTA sent a proposed settlement agreement to Ms. Paige via email to Attorney Deyoe.  It offered $5,000 and proposed to resolve not only the ADA claims in the complaint but also other unasserted claims, including any potential claim under the Age Discrimination in Employment Act ("ADEA"), a statute that requires that any waiver must be in a writing that is revocable for at least seven days after execution.  ECF No. 22-2 at 13-27.  For the next seven months, Attorney Deyoe made no response to RIPTA's offer.  Then, on March 26, 2020, the Court ordered the case to mediation

with the Court-annexed mediator; the referring Order mandates that Ms. Paige and her attorney "shall participate in the mediation in good faith." ECF No. 15 at 1.

Three months later, on July 1, 2020, Attorney Deyoe informed the Court that the parties were in agreement on RIPTA's proposed amount ($5,000), but that there was still ongoing discussion of the "language with the release." ECF No. 22-2 at 35. On January 6, 2021, the Court's case manager advised the parties that "Judge McConnell asked me to check on the settlement of the above case." Id. at 43. In response, Attorney Deyoe for the second time informed the Court that, "[t]he settlement number is agreed on," but that she wanted the release language to be approved by Ms. Paige's attorney in the still-ongoing personal injury case. Id. at 42. Next, on February 1, 2021, the case was placed on the Court's trial calendar. In response, Attorney Deyoe (in a signed writing joined by counsel for RIPTA) advised the Court that the settlement was concluded in that Ms. Paige and RIPTA had reached an agreement in principle for resolution and that a dismissal stipulation would be filed in no more than thirty days. ECF No. 17. In light of this "Joint Motion to Remove from Trial Calendar," the Court relied on the representation of a settlement and promptly removed the case from the trial calendar.

In testimony[4] that I find to be credible, Attorney Deyoe confirmed that all of these representations that she made to the Court over the period from July 2020 through February 2021, first about an agreement regarding the settlement amount and then regarding the final agreement, were true. Invoking the attorney-client privilege, Attorney Deyoe declined to testify

---

[4] In light of Ms. Paige's testimony regarding her lack of communication with Attorney Deyoe regarding settlement after her 2018 instruction that she would not accept less than $30,000, the Court directed Attorney Deyoe to testify. In so doing, Attorney Deyoe was scrupulous in protecting Ms. Paige's attorney-client privilege by declining to answer any question about the content of their communications. The only exception was regarding communications as to which Ms. Paige had waived the privilege by testifying spontaneously about the content of what otherwise would have been privileged communications.

5

regarding the substance of her contemporaneous communications with Ms. Paige, which formed

the basis for her representations to the Court, except for confirming that, prior to March 18,

2021, she had discussed the amount of the settlement ($5,000) with Ms. Paige.  This aspect of

Attorney Deyoe's testimony is in direct conflict with Ms. Paige's testimony (which I do not find

to be credible) that, in 2018, she had authorized settlement for no less than $30,000 and she

never spoke to Attorney Deyoe again about the settlement amount, as well as that she would not

have settled for $5,000 because "that's like a slap in the face."  Specifically, I find that Attorney

Deyoe spoke to Ms. Paige about settling for $5,000 prior to March 2021, that Ms. Paige had

assented to settling for $5,000 as early as July 2020 and that Ms. Paige communicated her assent

to that settlement amount to Attorney Deyoe, who relied on it in making appropriate and truthful

representations to the Court.

The next relevant event occurred on March 18, 2021, when Ms. Paige came to Attorney

Deyoe's office to sign the Settlement Agreement.  Attorney Deyoe testified that she met with

Ms. Paige in the presence of her paralegal and went through the Settlement Agreement (which

includes the $5,000 monetary amount in Paragraph 1(a)) with Ms. Paige, explaining it page by

page; Ms. Paige then signed it in Ms. Deyoe's presence.  The signature page that Ms. Paige

signed included the following warning in bold and all capital letters:

> SHE HAS CAREFULLY READ AND FULLY UNDERSTANDS ALL OF THE
> PROVISIONS OF THIS AGREEMENT, THAT SHE IS VOLUNTARILY
> ENTERING INTO THIS AGREEMENT, AND THAT SHE DOES NOT AND
> HAS NOT RELIED IN ANY WAY ON ANY REPRESENTATIONS OR
> STATEMENTS MADE BY RIPTA OR THEIR ATTORNEYS NOT
> CONTAINED IN THIS AGREEMENT.  PAIGE IS HEREBY INSTRUCTED
> TO READ THIS AGREEMENT CAREFULLY, AS IT CONTAINS A
> RELEASE OF ALL KNOWN AN UNKNOWN CLAIMS.

ECF No. 22-2 at 62.  On the same day, Ms. Paige also filled in and signed an IRS W-4 form.  Id.

at 65.  These executed documents were emailed by Attorney Deyoe's paralegal to counsel for

RIPTA at 11:43 a.m. on March 18, 2021.  Id. at 49.  During the hearing before me, Attorney

Deyoe corroborated Ms. Paige's testimony that she did not herself read the Settlement

Agreement during the March 18, 2021, meeting.  However, Attorney Deyoe also represented to

the Court that this Settlement Agreement, as signed on March 18, 2021, memorializes the

agreement of the parties.[5]

Ms. Paige's testimony about the events of March 18, 2021, is different.  According to her,

as of that date, she had had no communications about the case with Attorney Deyoe in more than

a year and a half; that is, March 18, 2021, was their first interaction since early in the case.  On

that day, according to Ms. Paige, Attorney Deyoe handed Ms. Paige a "piece of paper" and told

her to sign it, which she did ("I signed something"); Attorney Deyoe told her nothing, except that

she had seven days to revoke whatever she had signed.  Ms. Paige testified that she did not know

that the Settlement Agreement called for payment of $5,000 and would not have signed the paper

if she had known.  Ms. Paige claimed she did not even see the Settlement Agreement until she

was served with Attorney Deyoe's motion to withdraw seven days later, on March 25, 2021.  She

testified that she never read the Settlement Agreement.  Ms. Paige subsequently admitted that the

page she signed on March 18, 2021, was not blank, but included the caution instructing her to

read the Agreement, as quoted above, as well as that a copy of the Settlement Agreement may

have been in the room when she met with Attorney Deyoe on March 18, 2021, although she is

certain she did not look at or read it.

In weighing the testimony of Attorney Deyoe and Ms. Paige regarding what happened on

March 18, 2021, I find that Ms. Paige signed the Settlement Agreement with full knowledge and

---

[5] At the outset of the hearing on the motion to enforce, Attorney Deyoe represented to the Court that the
only factual issue for determination is whether Ms. Paige effectively revoked the Settlement Agreement
in accordance with Paragraph 8, which is discussed *infra*.

understanding of and full agreement to its terms, including that the settlement amount was $5,000.  I also find that Ms. Paige did not read the Settlement Agreement herself; rather, Attorney Deyoe explained its contents to her.

After the Settlement Agreement was signed, but before the seven-day revocation period had run, Attorney Deyoe appeared in Court on Ms. Paige's behalf.  On March 22, 2021, joined by counsel for RIPTA, she represented to the Court on the record that "[t]his case is settled and a dismissal stipulation will be filed on or before March 26, 2021."  Minute Entry of Mar. 22, 2021.

### B.    Attempted Revocation

Drafted to comply with ADEA, Paragraph 8 of the Settlement Agreement makes the entire[6] agreement revocable for seven days after execution and provides two ways to exercise the right to revoke.  ECF No. 22-2 at 56 ¶ 8.  First, the "written notice of revocation" could be delivered to RIPTA's attorney by mail sent to the address listed in the Settlement Agreement; if this method were chosen, the notice had to be "postmarked" by the deadline.  Id.  Or, second, the written notice could be hand-delivered to RIPTA's attorney's office at the same address by the same deadline.  Id.  The parties do not materially dispute that the deadline for an effective revocation was the "close of business," that is 5:00 p.m.,[7] on Thursday, March 25, 2021.

---

[6] RIPTA argues that, if the Court finds that the revocation was effective, it could still enforce the Settlement Agreement, excepting only the superfluous ADEA waiver.  However, as Attorney Deyoe pointed out, Paragraph 8 is not so limited and the Settlement Agreement has a merger clause, which precludes such an interpretation.  See Neely v. Good Samaritan Hosp., 345 F. App'x 39, 44-45 (6th Cir. 2009).  This argument is rejected.

[7] During the hearing, Attorney Deyoe argued that the Court needs to interpret the meaning of "close of business," as referenced in Paragraph 8.  I find that "close of business" is unambiguous and means 5:00 p.m.  See Macaluso v. Keyspan Energy, No. CV 05-0823 (ADS) (WDW), 2007 WL 1041662, at *3 (E.D.N.Y. Apr. 3, 2007) ("'close of business' is commonly understood to mean 5:00 p.m.").  If there is ambiguity, Ms. Paige's testimony that Attorney Deyoe told her the deadline was "close of business," which she understood to mean 5:00 p.m., as well as the frantic efforts of Ms. Paige and Attorney Deyoe's paralegal to effectuate delivery of the written revocation notice by 5:00 p.m., clinches the matter.

At some point after she signed the Settlement Agreement, Ms. Paige testified that she talked to her son; based on this conversation, on the last day, March 25, 2021, she decided she wanted to revoke.  Ms. Paige also testified that the first time that she ever saw the Settlement Agreement and learned that it called for payment of $5,000 was on or after March 25, 2021, after Attorney Deyoe sent Ms. Paige her motion to withdraw; that discovery also triggered her decision to revoke.  To implement this decision, she called Attorney Deyoe.  According to her testimony, Attorney Deyoe advised her that the written revocation notice had to be delivered to RIPTA's counsel's office by the "close of business" on that day (March 25).  Ms. Paige said she understood that the "close" of the day means 5:00 p.m.  At 2:21 p.m. on March 25, 2021, Ms. Paige emailed Attorney Deyoe regarding her decision.  Her message complains that she had not yet received the net compensation coming to her from the personal injury case and states:

> I would like to withdraw my release disclosed, I believe that I have a case.  I was discriminated against at my job.
>
> I would like to explore a second opinion.  I feel I'm rush [sic] into signing this disclosure, which would stop me from pursuing my case any further.

ECF No. 22-2 at 73.  An hour later, at 3:17 p.m., Ms. Paige forwarded this email to counsel for RIPTA.  Ms. Paige also claims that, before 5:00 p.m., she left a handwritten letter at RIPTA's offices captioned "Re: Release," a copy of which she texted to Attorney Deyoe.  Ms. Paige testified that she tried to do the best that she could to revoke by 5:00 p.m.

Attorney Deyoe also took steps to give timely notice of revocation.  She forwarded a text from Ms. Paige (attaching the handwritten version of the note regarding her desire to revoke) to her paralegal and instructed the paralegal to deliver it to RIPTA's

counsel.  ECF No. 23-1.  At 4:13 p.m., the paralegal[8] emailed Ms. Paige's handwritten

note (as well as the just-filed motion to withdraw) to RIPTA's counsel and advised that

she was on her way to hand-deliver the notice.  Id. ¶ 5.  At 4:42 p.m., the paralegal began

the drive, but had difficulty parking.  ECF No. 28 ¶ 3.  She avers that, at 4:55 p.m., she

parked and entered the lobby of the multi-office high rise building where RIPTA's

counsel's offices are located.  Id. ¶ 4.  The time-stamped video footage from the camera

covering the lobby shows that she entered the lobby seconds after 5:00 p.m.  ECF No. 27-

1 at 5 (Video Attachment).  Attorney Deyoe argues that the video's time stamp might not

be accurate in that the paralegal may actually have entered the lobby moments earlier

than 5:00 p.m.  However, after the paralegal spoke with the security guard in the lobby,

minutes after 5:00 p.m. (as shown on the time-stamped video footage of the lobby), he

twice tried to make phone calls and then took the elevator up to look for someone in the

law firm; all his efforts were unsuccessful.  ECF No. 23-1 ¶¶ 8-11.  By affidavit,

RIPTA's counsel corroborated the timing on the video in that the message to her from the

lobby security guard was left at 5:03 p.m.  ECF No. 31 ¶ 4.  The paralegal also left a

voice message for RIPTA's counsel at 5:10 p.m.; the paralegal then left the lobby without

making a delivery of Ms. Paige's written notice of revocation.  ECF No. 23-1 ¶¶ 14-16.

It is unknown whether counsel for RIPTA was present in her office as these

events were unfolding.  However, it is undisputed that, by the deadline (5:00 p.m. on

March 25, 2021) in the Settlement Agreement, Ms. Paige's written notice of revocation

---

[8] The paralegal submitted two affidavits regarding these events (ECF Nos. 23-1 & 28) and Attorney
Deyoe proffered her as a witness.  Finding no meaningful factual dispute regarding the paralegal's
averments, I did not ask her to testify.

was neither postmarked for delivery, nor successfully hand-delivered, to the office

located at the address listed in Paragraph 8.

## II.     STANDARD OF REVIEW

The Court has the power to summarily enforce a settlement agreement entered into by the

litigants "provided that there is no genuinely disputed question of material fact regarding the

existence or terms of that agreement."  Fid. & Guar. Ins. Co. v. Star Equip. Corp., 541 F.3d 1, 5

(1st Cir. 2008).  If a genuine dispute does materialize, then "the court should hold a hearing and

resolve the contested factual issues," because settlement is preferred to costly and time-

consuming litigation.  Page v. Musician's Friend, Inc., Civil No. 8-106-P-H, 2009 WL 418648,

at *1 (D. Me. Feb. 18, 2009); see Swift v. Frontier Airlines, Inc., 636 F. App'x 153, 156 (4th Cir.

2016) ("[I]f there is a substantial factual dispute over either the agreement's existence or its

terms, then the district court must hold an evidentiary hearing."); Neely v. Good Samaritan

Hosp., 345 F. App'x 39, 42 (6th Cir. July 31, 2009) (motion to enforce requires evidentiary

hearing and testimony from party and attorney); Malave v. Carney Hosp., 170 F.3d 217, 220 (1st

Cir. 1999) (if there is genuinely disputed question of material fact regarding existence or terms of

agreement, court must take evidence to resolve contested issues of fact); Tiernan v. Devoe, 923

F.2d 1024, 1031 (3d Cir. 1991) (when material facts concerning existence or terms of agreement

to settle are disputed and credibility determinations are involved, parties must be allowed

evidentiary hearing).  "[I]t is conventional for the court before whom the case is pending to

enforce a settlement agreement, assuming it is valid."  Bandera v. City of Quincy, 344 F.3d 47,

51 (1st Cir. 2003).  As our Circuit has acknowledged, "[i]t would generally be preposterous to

conduct a trial in the teeth of a valid settlement agreement and award damages – only to have the

resulting judgment unwound by a contract action or similar remedy implementing the settlement agreement."  Id.

When a settlement collapses before the original suit has been dismissed, the party who wants to enforce it may file a motion for enforcement in the still-pending case.  See United States v. Hardage, 982 F.2d 1491, 1496 (10th Cir. 1993) ("A trial court has the power to summarily enforce a settlement agreement entered into by the litigants while the litigation is pending before it.").  In a federal court case brought under federal law, the Court's jurisdiction over the motion to enforce is derived from its jurisdiction over the case.  Roman-Oliveras v. P.R. Elec. Power Auth. (PREPA), 797 F.3d 83, 86 (1st Cir. 2015).  Such a motion is determined in accordance with federal law, although federal courts are normally "free to borrow from state law," absent any conflict between federal interests and the borrowed state law.  Commonwealth Sch., Inc. v. Commonwealth Acad. Holdings LLC, 994 F.3d 77, 85 (1st Cir. 2021).  In connection with enforcement of settlement agreements, federal common law incorporates the "common-sense canons of contract interpretation."  Id. at 87 (quoting Burnham v. Guardian Life Ins. Co. of Am., 873 F.2d 486, 489 (1st Cir. 1989)).

## III.   LAW, ANALYSIS AND RECOMMENDATION

### A.   Formation of Binding Settlement Agreement

"Settlement agreements enjoy great favor with the courts 'as a preferred alternative to costly, time-consuming litigation.'"  Fid. & Guar. Ins. Co., 541 F.3d at 5 (quoting Mathewson Corp. v. Allied Marine Indus., Inc., 827 F.2d 850, 852 (1st Cir. 1987)).  To that end, courts must "give significant deference to the terms of a general release until [they] have been furnished with an adequate reason to do otherwise."  Pardey v. Blvd. Billiard Club, 518 A.2d 1349, 1345 (R.I. 1986).  If the converse were true and "releases were taken lightly and rescinded, the incentive to

settle would dissipate and parties opting for such a course could never be secure from litigation."
Griffin v. Bendick, 463 A.2d 1340, 1345 (R.I. 1983).  "The solemnity with which the federal
courts approach settlement agreements cannot be overstated."  Abdullah v. Evolve Bank & Tr.,
No. CA 14-131 S, 2015 WL 4603229, at *5 (D.R.I. July 29, 2015).

 In Rhode Island, settlement agreements are governed by "general contract law
principles."  Friedrich v. S. Cty. Hosp. Healthcare Sys., C.A. No. 14-353 S, 2017 WL 57786, at
*1 (D.R.I. Jan. 5, 2017) (quoting Furtado v. Goncalves, 63 A.3d 533, 538 (R.I. 2013)).  The
formation of a contract requires both an offer and an acceptance.  See Ardente v. Horan, 366
A.2d 162, 165 (R.I. 1976).  A party's signature on the document is sufficient evidence of assent.
Homonoff v. Forte, Nos. PC-2008-1467, PC-2008-6628, 2013 WL 212992, at *7 (R.I. Super. Ct.
Jan. 16, 2013) (citing Davis Sewing-Mach. Co. v. Richards, 115 U.S. 524, 525 (1885)).  "[A]
final, written version of the settlement agreement with clear, complete, and explicit terms that
was voluntarily signed by all parties" must be enforced.  Jefferson v. Piccirillo, No. 14-475-M-
LDA, 2015 WL 3700796, at *3 (D.R.I. June 12, 2015), aff'd, (1st Cir. Apr. 13, 2016).  However,
"[w]here there has been no meeting of the minds sufficient to form a complete settlement
agreement, . . . the case [must be] restored to the docket for trial."  United States v. 434 Main St.,
Tewksbury, Mass., Civil Action No. 09-11635-JGD, 2011 WL 6337454, at *3 (D. Mass. Dec.
16, 2011) (alterations in original).

 The validity of a settlement agreement should be assessed, *inter alia*, in light of "whether
the person executing the release was represented by counsel."  Miller v. Metro. Prop. & Cas. Ins.
Co., 111 A.3d 332, 340 (R.I. 2015).  Further, when parties are represented by counsel who had
actual authority to act on their behalf, they are bound to a settlement agreed to by counsel.[9]  Witt

---

[9] In this Circuit, an attorney must have actual authority to bind the client to a settlement agreement.
Malave, 170 F.3d at 221 ("a settlement agreement entered into by an attorney is ineffective if the attorney

v. Am. Airlines, Inc., 332 F. Supp. 3d 442, 445 (D. Mass. 2018), modified, Civil Action No. 14-40161-TSH, 2018 WL 5303039 (D. Mass. Oct. 25, 2018); see Michaud v. Nexxlinx of Maine, Inc., No. 1:13-cv-270-JDL, 2015 WL 728497, at *3 (D. Me. Feb. 19, 2015) (when litigant voluntarily chose attorney as his representative, he "cannot now avoid the consequences of the acts or omissions of his freely selected agent"; settlement agreement enforced). Roy v. Comm'r, N.H. Dep't of Corr., No. 09-cv-75-SM, 2011 WL 5041398, at *1 (D.N.H. Oct. 24, 2011) ("action taken in the conduct and disposition of civil litigation by an attorney within the scope of his authority is binding on his client"). "Policy favors the enforcement of settlement agreements so as to hold people to the contracts they make and to avoid costly and time-consuming litigation." Hansen v. R.I.'s Only 24 Hour Truck & Auto Plaza, Inc., 962 F. Supp. 2d 311, 315 (D. Mass. 2013).

In the circumstances of this case, I have no difficulty finding that Ms. Paige entered into a binding Settlement Agreement when she signed page twelve of the Settlement Agreement, together with the IRS W-4 form at her meeting with Attorney Deyoe on March 18, 2021.  Her principal reason for arguing that she is not bound – that she did not read the Settlement Agreement – fails as a matter of law.  It is well settled that "a party who signs an instrument manifests his assent to it and cannot later complain that he did not read the instrument or that he did not understand its contents." A.J. Amer Agency, Inc. v. Astonish Results, LLC, C.A. No. 12-351 S, 2014 WL 3496964, at *15 (D.R.I. July 11, 2014).  Further, Ms. Paige admits that she met with Attorney Deyoe that day, that the Settlement Agreement may have been in the room,

---

did not possess actual authority to bind the client"); Perry v. Alexander, 2:15-cv-00310-JCN, 2018 WL 493004, at *4 (D. Me. Jan. 19, 2018) (attorney can bind client to settlement agreement if attorney has actual authority, as distinguished from general authority to represent client's interests); Lopes v. Beland, Civil Action No. 11-cv-12063-DJC, 2015 WL 5001191, at *4 (D. Mass. May 14, 2015) (attorney may only bind client to compromise where client has authorized him/her to do so).

and that she signed the last page with its prominent warning about the importance of reading the preceding pages.  I find credible Attorney Deyoe's testimony about their careful review together of every page of the Settlement Agreement; I do not find credible Ms. Paige's testimony that she simply signed a "piece of paper" and was told only that it was revocable in seven days.  Also pertinent is Attorney Deyoe's credible testimony regarding her communications during the period from July 2020 through February 2021 – with Ms. Paige regarding the $5,000 settlement amount – and with the Court during which she represented, first, that the parties had reached agreement as to the settlement amount, and subsequently, that there was an agreement in principle to settle as to all issues.  Not credible is Ms. Paige's testimony that Attorney Deyoe never communicated with her at all during this period and that the only authority she gave Attorney Deyoe was her 2018 position that she would not settle for less than $30,000.  Importantly, Ms. Paige's actions on March 25, 2021, clearly affirm that she knew she had signed a binding Settlement Agreement seven days before.  Her written revocation notice expressly states that she understood that the Settlement Agreement "would stop me from pursuing my case any further" if not timely revoked in accordance with its terms.  See Copeland v. Dapkute, Case No. 8:17-cv-01566-PWG, 2018 WL 5619672, at *5 (D. Md. Oct. 30, 2018) (vigorous attempts to revoke agreement indicate that plaintiff knew parties had reached binding agreement to settle).

Based on the foregoing, I find that the parties entered into a binding agreement to settle this case, and that the terms of their agreement are unambiguously set forth in the Settlement Agreement that Ms. Paige signed on March 18, 2021.  Therefore, I recommend that the motion to enforce be granted unless Ms. Paige effectively revoked her agreement.

**B.     Effectiveness of Attempted Revocation**

While conceding that she did not succeed in "delivering" written notice of revocation as required by Paragraph 8 of the Settlement Agreement, Ms. Paige argues that the actions that were taken – two emails, the drop-off of the handwritten notice at RIPTA's offices and the failed attempt at hand-delivery by Attorney Deyoe's paralegal – should be deemed to be enough.[10] Unfortunately for Ms. Paige, the parties and the Court have found only one on-point case dealing with an analogous situation – Copeland, 2018 WL 5619672, decided by a respected jurist in the District of Maryland.  In Copeland, the settlement agreement contained revocation language similar to what is in the Settlement Agreement in this case, in that it required "delivery" of written notice of revocation to a specified address by a specified time.  Id. at *5.  Like Ms. Paige, before the deadline for revoking, the Copeland plaintiff sent an email that unambiguously expressed her intent to revoke.  Id. at *6.  On the last day for revocation, she also hired a courier service to hand-deliver the written revocation notice, but the courier did not make the delivery until after the deadline had passed.  Id.  Copeland acknowledges that the plaintiff undoubtedly intended to revoke, but that her "[i]ntent . . . is not the issue."  Id.  Based on the failure of the plaintiff to comply with the settlement agreement's express term requiring a written notice of revocation to be "delivered," the motion to enforce was granted.  Id. at *10; see Wood v. Denver

---

[10] Attorney Deyoe argued that the Court should find that the revocation was effective because "delivery" is ambiguous when referencing hand-delivery to an office during the COVID-19 pandemic, as well as that the Court should consider whether hand-delivery was possible if RIPTA's counsel was not in her office at 5:00 p.m. on March 25, 2021.  These arguments are a red herring.  The Settlement Agreement created a clear alternative "delivery" method that would not have been impacted by the pandemic – Ms. Paige could easily have gone to a post office and gotten her written notice postmarked for delivery before the deadline.  Further, if Ms. Paige had wanted a second delivery method not impacted by pandemic challenges, she could have bargained for it before signing the Settlement Agreement on March 18, 2021.  At bottom, Ms. Paige set her attempt to revoke in motion too late to get it done.  Cf. Abdullah, 2015 WL 4603229, at *3 (when effort to comply with settlement agreement comes a "day late and a dollar short," sanctions appropriate).  As in Copeland, this Court "can only enforce the agreement; it cannot rewrite it to give one party the benefit of a more favorable bargain than the one into which she entered."  Copeland, 2018 WL 5619672, at *6.  This argument – that the Settlement Agreement should be deemed to be revoked because the paralegal arrived in the lobby right at 5:00 p.m. but hand-delivery thereafter was impossible due to COVID-19 and RIPTA's counsel's presumptive absence from her office – is rejected.

Dep't of Revenue, 45 F.3d 377, 378 (10th Cir. 1995) (plaintiff who had second thoughts on seventh day failed to revoke where her attorney did not respond to her calls and timely revocation was not accomplished).  Copeland holds that a claimant "who knowingly and voluntarily entered into an agreement and then failed to revoke her assent in accordance with its explicit terms, is bound by the terms of the agreement she signed."[11]  2018 WL 5619672, *9.

Copeland is persuasive.  Based on Copeland, I conclude that Ms. Paige's unsuccessful attempt to "deliver" the written notice of revocation was not effective and that the Settlement Agreement is not revoked.

## IV.    CONCLUSION

At the close of the hearing, Ms. Paige described how upset and disappointed she is by the handling of her workers' compensation and third-party personal injury matters; she stated that she feels manipulated and that she is still getting slapped in the face by RIPTA.  The problem is that all of these concerns are beyond the scope of what she asserted in this case.  Having agreed to settle for $5,000, having signed a binding Settlement Agreement based on the advice of able counsel and having failed to revoke the Agreement in accordance with its express terms, she is now contractually bound to dismiss this case with prejudice in consideration for $5,000, which RIPTA is contractually bound to pay.  Based on the foregoing, I recommend that the motion to enforce (ECF No. 22) be granted.

---

[11] Copeland also separately examines whether that plaintiff's waiver of her rights under ADEA and other similar statutes was knowing and voluntary.  2018 WL 5619672, at *8-9.  In finding that it was, the court considered such factors as how long the employee had been aware of the now disputed settlement term, whether the employee was represented by counsel during the negotiations, whether the employer had pressured or lied to the employee during the negotiation, the employee's sophistication and the appropriateness of the consideration.  Id. at *8.  Apart from the lack of information regarding Ms. Paige's sophistication, the facts as found above pertaining to each of these factors support the same conclusion – that Ms. Paige's waiver was knowing and voluntary.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days of its receipt.  <u>See</u> Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision. <u>See</u> <u>United States v. Lugo Guerrero</u>, 524 F.3d 5, 14 (1st Cir. 2008); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).

<u>/s/ Patricia A. Sullivan</u>
PATRICIA A. SULLIVAN
United States Magistrate Judge
June 9, 2021

18